HAWTHORNE'S, INC. *vs.* WARRENTON REALTY, INC., & others.[1]

Suffolk. October 5, 1992. - January 25, 1993.

Present: ABRAMS, NOLAN, LYNCH, & GREANEY, JJ

*Real Property*, Option, Right of first refusal, Specific performance. *Contract*, Implied covenant of good faith and fair dealing, Option, Sale of real estate, Specific performance.

A judge acted within his discretion in denying a lessee's claim for specific performance under an option to purchase, contained in a lease of a parcel of commercial real estate, in light of the judge's warranted findings that the lessee had engaged in unconscionable conduct, involving delay, misrepresentation, and manipulation, that dissuaded a competing prospective buyer from purchasing the premises. [208-210]

A judge correctly denied a lessee's claim seeking damages for alleged breach of an option to purchase, contained in a lease of a parcel of commercial real estate, where the judge was warranted in concluding that the lessee itself had committed a breach of the lease by violating its implied covenant of good faith and fair dealing with respect to its purchase rights and where the lessee's breach was materially related to its claim for damages. [210-211]

CIVIL ACTION commenced in the Superior Court Department on September 5, 1985.

The case was heard by *Charles F. Barrett*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Robert M. Bonin (Gerald P. Stewart* with him) for the plaintiff.

*Gordon T. Walker (James J. Haggerty* with him) for the defendants.

---

[1]Stuart W. Pratt individually, and Frederic N. Halstrom and Stuart W. Pratt as trustees of the 100 Warrenton Street Real Estate Trust.

GREANEY, J. This case involves a commercial real estate lease granting the plaintiff lessee, Hawthorne's, Inc. (Hawthorne's), both a right of first refusal and an option to purchase the premises at a fixed price. Hawthorne's brought suit in the Superior Court against the lessor, Warrenton Realty, Inc. (Warrenton), and subsequent owners of the premises, following its unsuccessful attempt to exercise its option to purchase. After a nonjury trial, a judge of the Superior Court concluded that Hawthorne's had lost its rights under the lease and rejected its claims for specific performance and damages.[2] Hawthorne's appealed, and we transferred the case to this court on our own initiative. We affirm the judgment.

1. *The decision below.* The judge made sixteen pages of meticulous and comprehensive findings of fact, based principally on oral testimony which was at times contradictory. Having heard the testimony, the judge was in the best position to evaluate the credibility of the witnesses. See *Simon* v. *Weymouth Agric. & Indus. Soc.*, 389 Mass. 146, 148 (1983). The record supports the judge's findings. See Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974).

We summarize the relevant facts. The premises at issue, 100 Warrenton Street, Boston, were the sole asset of Warrenton Realty, Inc., a corporation wholly owned by Stuart W. Pratt, a licensed real estate broker. Hawthorne's had owned and conducted a restaurant business at the premises prior to the execution of the subject lease. The lease, executed on May 23, 1980, and commencing on June 1, 1980, was for a ten-year period with two five-year options to extend. At the time the lease was being negotiated, the principals of Hawthorne's, Felix Paige, Jackson Gateman, and Louis Rosen, had numerous discussions with Pratt concerning their desire to purchase the premises. Hawthorne's, however, lacked the financial ability to purchase the premises at

---

[2]The judge also found that the plaintiff had not proved that the defendants had violated G. L. c. 93A. That finding has not been challenged on appeal.

that time. Paige indicated that Hawthorne's intended to purchase the premises for $650,000 within the first eighteen months of the lease. Based on these discussions, the parties included the following two clauses in the lease:

"*ARTICLE XXVI - Right of First Refusal.* If Landlord receives a bona fide offer to sell the Premises, Landlord shall convey the business terms thereof, including any financing contingencies by written notice to Tenant. Tenant shall have fifteen (15) days after such notice is sent by certified mail, return receipt requested, to exercise a right of first refusal to acquire the Premises upon the same terms and conditions, Tenant's acceptance being given by forwarding to Landlord within such period, written acceptance of the offer and the deposit required thereby by bank or certified check. The sale will consummate in the time period set forth in the terms of the sale, and the parties shall enter into the standard Greater Boston Real Estate Board form reflecting the transaction, but providing for liquidated damages if Tenant defaults.

"If Tenant is in default hereunder (utilizing allowed grace periods) in the payment of moneys when such offer is forwarded to Tenant, Tenant shall have no right of first refusal hereunder. If the Premises [are] sold, Tenant's right of first refusal and its option to purchase is thereby void.

"*ARTICLE XXVII - Option to Purchase.* The Tenant shall have an option to purchase the Premises at any time during the first two years of the term for the sum of $650,000, or at any time during the next three years of the term for the sum of $675,000, provided Tenant is not in default of any of the provisions of this Lease, by notifying the Landlord in writing, certified mail, return receipt requested, of its intention to exercise said option. Notice to the Landlord shall be accompanied by a deposit of a bank or certified check in the amount of 10% of said purchase price and a standard Greater Boston

Real Estate Board form reflecting the transaction, but providing for liquidated damages in the amount of the deposit if Tenant default. Tenant shall have thirty (30) days after said notice is sent to consummate the sale."

After the lease commenced, Pratt began to experience financial difficulties and decided to sell the premises. He made contact with Paige and Rosen and explained that he would place the premises on the market if Hawthorne's could not purchase them. In January, 1981, Paige told Pratt not to market the premises because Hawthorne's would be purchasing them. Hawthorne's, however, did not attempt to exercise its purchase rights under the lease, but continued to negotiate with Pratt concerning the terms of its purchase.

During the next months, Pratt conducted discussions with other interested parties and negotiated two separate potential deals, both with a purchase price of $665,000, which were evidenced by written offers signed in May, 1981. The first offer was from Alan Lewis, a successful and experienced real estate businessman. The written offer, including a $65,000 deposit, was good until June, 1981, and contemplated execution of a purchase and sale agreement on or before July 15, 1981. Since Lewis, however, was aware of the purchase rights of Hawthorne's under the lease and of Pratt's ongoing negotiations with Hawthorne's, he orally agreed to leave the offer open for an indefinite period. The judge specifically found that the Lewis offer was bona fide.

The second, and less appealing, offer resulted from Pratt's negotiations with Frederic N. Halstrom, an attorney with no prior experience in real estate ventures. Although Pratt wished to sell his entire interest in the premises, Halstrom wanted to share the risk of ownership and also wanted to keep Pratt involved in the management of the premises. They orally agreed to form a trust to purchase the premises, with each of them holding a fifty per cent beneficial interest. The written offer was signed by Pratt and Halstrom (Pratt-Halstrom offer), as trustees of the 100 Warrenton Street Real Estate Trust (100 Warrenton Trust). Halstrom provided a

$65,000 check as a deposit. By its terms, the offer was good until October 15, 1981, and contemplated execution of a purchase and sale agreement on or before October 25, 1981.

Warrenton notified Hawthorne's of the offer from Lewis by a letter dated May 20, 1981, sent registered mail. The letter stated that Warrenton had "received a written offer to purchase [the premises] in the amount of $665,000 of which $65,000 has been made as a deposit, to be closed on or before July 15, 1981." Upon receipt of the letter, Gateman made contact with Pratt and asked for the name of the offeror. Pratt identified Lewis. Gateman did not believe that Lewis's offer was bona fide and called Lewis, who responded that his offer was indeed genuine. Gateman then attempted to dissuade Lewis from purchasing the premises by informing him of alleged problems with the building.[3] Gateman also warned Lewis that he would not let Lewis purchase the premises.

Despite the existence of the two offers and Gateman's conduct with Lewis, Pratt continued to negotiate with Hawthorne's. At a meeting held in late May or early June, 1981, Pratt showed both outstanding offers to Paige and Rosen and discussed the offers in great detail. It became clear at this meeting that the three principals of Hawthorne's were not in agreement concerning the purchase of the premises. Paige stated that Gateman, who was not present, did not believe that the Lewis offer was bona fide and was not interested in purchasing the premises. Paige and Rosen, however, discussed price and various ways of structuring a deal with Pratt. Pratt informed them that Warrenton was not interested in a sale to Hawthorne's unless Gateman joined or provided a release.

Following this meeting, Pratt received a draft of a proposed agreement from Paige and Rosen. Pursuant to this agreement, Paige and Rosen would purchase the stock of Warrenton and assume the mortgage liability outstanding on

---

[3]The transcript reveals that Gateman asked Lewis if he knew that there were problems with the boiler and leaks in the roof. When questioned whether these problems really existed, Gateman admitted that he was not aware of any problems.

the premises. Under these terms, the premises would be purchased for approximately $425,000. Pratt notified Hawthorne's that the agreement was not acceptable because it was not worth as much as the $665,000 offer from Lewis and did not contain a release from Gateman.

In July, 1981, Pratt and Gateman met at Gateman's suggestion because Gateman was concerned that Paige and Rosen were attempting to purchase the premises individually. The proposed stock sale agreement was produced and shown to Gateman. It was clarified that any sale of the premises would be through Hawthorne's and not Paige and Rosen individually. Pratt explained that there were two outstanding offers to purchase the premises for $665,000, one from Lewis and one from Pratt-Halstrom. Gateman again expressed his belief that the Lewis offer was not bona fide. Following this meeting, however, Gateman called Pratt and told him that Hawthorne's would be purchasing the premises and would send a confirming letter. Pratt was led to believe that Hawthorne's would pay either $650,000 or $665,000 for the premises.

Following Gateman's call, Pratt made contact with Lewis to inform him that their deal was dead because Hawthorne's was going through with the purchase. Pratt then received the confirmation letter from Hawthorne's. The August 7, 1981 letter purported to be "notice from Hawthorne's, Inc. of its exercise of its right to purchase the property on the same terms as had been agreed to with Messrs. Paige and Rosen." It stated, "If you will redo the papers, we can have an immediate closing." This letter raised confusion since Pratt had not agreed to the stock sale agreement and did not understand which papers the letter made reference to. Gateman then made contact with Pratt and informed him that Hawthorne's was only willing to proceed with the sale in accordance with the proposed stock sale agreement. Pratt again rejected this proposal.

In mid-August, 1981, Pratt finally learned that Hawthorne's would not be purchasing the premises because the three principals could not agree on a price. Pratt called

Lewis to inquire if he remained interested in the premises. Lewis had proceeded with the purchase of another building after learning that his deal with Warrenton was off, and declined to renew his offer. Pratt was thus compelled to go forward with the deal he had negotiated with Halstrom. Hawthorne's was notified by letter, hand delivered on September 10, 1981, that the premises were being sold for $665,000. The letter did not identify the purchaser and a copy of the original notice of the Lewis offer was erroneously attached. Although Hawthorne's was not provided with written notification of the Pratt-Halstrom offer in accordance with the lease, Hawthorne's was made aware that a sale of the premises was pending. Hawthorne's, however, did not attempt to invoke either its right of first refusal or its option to purchase.

The sale to 100 Warrenton Trust was completed on November 20, 1981. The declaration of trust was executed that day and the premises were conveyed from Warrenton to Pratt individually, and then to Halstrom and Pratt as trustees. Hawthorne's was duly notified of the sale and thereafter complied with the request that rent payments be made to 100 Warrenton Trust. From the time that Hawthorne's was notified of the sale until March, 1985, Hawthorne's did not indicate its belief that it retained a valid option to purchase or claim that its right of first refusal had been violated. Rather, in 1982, one of Hawthorne's principals, Rosen, expressed his regrets that Hawthorne's had lost its rights to purchase under the lease and indicated his interest in purchasing the premises from Pratt and Halstrom sometime in the future. In March, 1985, however, Hawthorne's asserted that its option to purchase for $675,000 remained valid, and attempted to exercise its option.

The value of the property had steadily increased since the inception of the lease. In 1987 and 1989, the premises were appraised, unencumbered by the existing lease, at $1,600,000 and $1,750,000, respectively, with the leased fee estimated at $950,000 and $1,000,000, respectively.

Based on his findings, the judge concluded that the lack of a formal trust document for the 100 Warrenton Trust at the time that the Pratt-Halstrom offer to purchase was made was not material because Pratt and Halstrom had expressed a clear intention to form a real estate trust and to buy the premises and, therefore, at the time of the offer, Pratt and Halstrom had created, and were bound by, an express oral trust. The judge further concluded that the transfer from Warrenton (a corporation whose stock was wholly owned by Pratt) to the 100 Warrenton Trust (a real estate trust whose beneficial interests were owned 50% by Pratt and 50% by Halstrom) constituted a "sale" which triggered rights of Hawthorne's under the lease, notwithstanding that party's arguments that: (a) the transfer was simply a mechanism for shifting Pratt's interest from "one hand to another"; and (b) only 50% of Pratt's actual interest was conveyed. The judge next decided that the notice given Hawthorne's of the Lewis offer did not excuse notice of the Pratt-Halstrom offer, and that the notice of the letter was "substantively deficient" because it referred only to the Lewis offer. The judge decided, however, that the deficiencies in the notice of the Pratt-Halstrom offer were not critical because various oral and written communications between the parties effectively conveyed notice of the Pratt-Halstrom offer to Hawthorne's. Based on this reasoning, the judge ultimately concluded that Hawthorne's was not entitled to specific performance under the provisions of the lease. As a separate and independent basis for denying Hawthorne's performance, the judge ruled that the conduct of Hawthorne's throughout was such to make applicable (and the judge applied) the equitable doctrines of laches, waiver and estoppel. Finally, the judge concluded that Hawthorne's had not proved a breach of contract, and, therefore, was not entitled to damages.

2. *Specific performance.* On appeal, Hawthorne's in its brief methodically attacks each of the judge's conclusions summarized above. Hawthorne's, in particular, concentrates attention on the judge's ruling that its option rights were terminated when Pratt sold one-half of his interest in the prem-

ises to Halstrom. According to Hawthorne's, the sale of less than Pratt's entire interest in the premises was not a valid sale within the meaning of the lease because Article XXVI contemplated a conveyance of the entire premises. Since no valid sale had occurred, Hawthorne's claims that its fixed price option continued as a separate binding and enforceable contract which did not expire until June 1, 1985.

We conclude that the judge's decision to deny specific performance can be upheld on a narrower basis than that outlined by the judge, which does not necessitate decision of the issue whether the Pratt-Halstrom offer to purchase and the ultimate transfer of the premises to the 100 Warrenton Trust constituted a "sale"[4] within the meaning of the purchase provisions in the lease or decision of the other contentions made by Hawthorne's to obtain equitable relief.

Specific performance is an equitable remedy which should not be granted when the requesting party has engaged in conduct "savored with injustice touching the transaction." *Economy Grocery Stores Corp.* v. *McMenamy*, 290 Mass. 549, 552 (1935). See also *Chute* v. *Quincy*, 156 Mass. 189, 191 (1892) ("Specific performance may be refused . . .

---

[4]We have never had occasion to decide whether a lessor's sale of less than his entire interest in leased premises is a sale within the meaning of lease provisions such as those involved in this case. Although several jurisdictions have addressed this issue in the context whether a lessee's right of first refusal is triggered when less than the entire premises is transferred, no clear consensus has been reached. See *Meyer* v. *Warner*, 104 Ariz. 44 (1968) (transfer of one joint owner's undivided interest in leased premises to other joint owner is a "sale" triggering lessee's right of first refusal); *Wilson* v. *Grey*, 560 S.W.2d 561 (Ky. 1978) (sale of interest from one joint owner to second did not constitute "sale" within meaning of "first refusal" clause); *Prince* v. *Elm Inv. Co.*, 649 P.2d 820 (Utah 1982) (lessor's transfer of property to partnership in which lessor retained a 51% interest was a "sale" for purposes of triggering lessee's right of first refusal). See also Annot., Right of First Refusal — "Sale," 70 A.L.R. 3d 203 (1976). While we do not reach this issue, we consider it significant that Pratt did not intend to circumvent Hawthorne's purchase rights by selling only a partial interest in the premises. See *Colonie Motors, Inc.* v. *Heritage Corp.*, 61 A.D.2d 1105 (N.Y. 1978). We further note that Halstrom's purchase of his 50% interest resulted from arms-length negotiations with Pratt.

where there has been . . . unfair conduct, although it may not be sufficient to invalidate the contract"); *Edinburg* v. *Edinburg*, 22 Mass. App. Ct. 199, 208 (1986); Nolan, Equitable Remedies § 262 at 374 n.7 (1975). The judge found that the principals of Hawthorne's had engaged in an unconscionable course of conduct intended to cause the failure of Pratt's offer from Lewis. This course of conduct commenced with Gateman's attempt to dissuade Lewis from purchasing the premises by both fabricating problems with the building and warning Lewis that Hawthorne's would block Lewis's purchase. It is more than obvious that Gateman meant that Hawthorne's would invoke its purchase rights under the lease to block the sale. Even more significant than Gateman's conversation with Lewis, however, was the conduct of the principals of Hawthorne's in falsely leading Pratt to believe that they would purchase the premises for $650,000 or $665,000 when they never intended to pay more than $450,000.[5] It was apparent that Pratt did not cancel his deal with Lewis until he believed that Hawthorne's would proceed to purchase the premises for at least the option price stated in the lease. The judge concluded that "[t]he conduct of Hawthorne's principals . . . directly caused the failure of the Lewis offer."

We reject the argument by Hawthorne's that the Lewis offer is irrelevant because it did not result in a sale of the premises. At the time Hawthorne's received notice of the Lewis offer, Hawthorne's could have bypassed its right of first refusal and exercised its option to purchase at the lower price. See *McDonald's Corp.* v. *Lebow Realty Trust*, 710 F.Supp 385, 389 (D. Mass.), aff'd, 888 F.2d 912 (1st Cir. 1989); *Shell Oil Co.* v. *Jolley*, 130 Vt. 482 (1972). Rather than exercising its rights under the lease, however, Haw-

---

[5]Hawthorne's does not persuasively challenge this finding which was amply supported by Pratt's testimony. According to Pratt, Paige and Rosen orally agreed to pay $650,000 at the meeting held in late May or early June, 1981. Pratt also testified that he never wavered from the $650,000 price in his discussions with the principals of Hawthorne's and that he was led to believe that they would meet this price.

thorne's engaged in unfair conduct, involving delay, misrepresentation and manipulation, which directly caused Pratt to lose his only other opportunity to sell his entire interest in the premises. That Hawthorne's now relies upon the fact that there was no sale to Lewis is offensive to all principles of equity and fairness. Pratt would not have been forced to proceed with his deal with Halstrom if Hawthorne's had not caused the Lewis offer to fail. In these circumstances, the conduct of Hawthorne's with regard to the Lewis offer, which, as the judge found equates with unconscionability, directly relates to the present claim of Hawthorne's concerning the validity of its option. See *Flynn* v. *Haddad*, 25 Mass. App. Ct. 496, 506 (1988). The judge acted within his discretion in denying specific performance.[6]

3. *Damages.* The judge also was correct in concluding that Hawthorne's was not entitled to contract damages.[7] Although the judge did not address the issue of damages precisely in these terms, we think the judge's findings support the conclusion that Hawthorne's itself had committed a breach of the lease by violating its obligation of good faith

---

[6]It is not of consequence in this case that the judge did not expressly invoke the equitable doctrine of "unclean hands." His findings support the doctrine on the basis that Hawthorne's should not be entitled to benefit from its dishonest manner in dealing with Pratt concerning its purchase of the premises, *Fisher* v. *Fisher*, 349 Mass. 675, 677 (1965), appeal after remand, 352 Mass. 592 (1967), and the application of the unclean hands doctrine is clearly within the scope of the judge's determination that the doctrines of laches, waiver, and estoppel independently operate to bar the request by Hawthorne's for specific performance. Even though our legal analysis differs from that of the judge, we are free to adopt different reasoning and affirm a judgment on grounds not specifically relied upon by the judge. See *Beeler* v. *Downey*, 387 Mass. 609, 613 n.4 (1982); *Alholm* v. *Wareham*, 371 Mass. 621, 625 (1976).

[7]Hawthorne's did not seriously attempt to establish the amount of contract damages either in its pleadings or at trial. At trial, Hawthorne's simply argued that the judge should reduce the $675,000 option price by the rent that Hawthorne's had paid since March, 1985 (less interest), in his order granting specific performance. Even if Hawthorne's was entitled to damages, Hawthorne's did not carry its burden of proving damages. See *National Grange Mut. Ins. Co.* v. *Walsh*, 27 Mass. App. Ct. 155, 157-158 (1989).

and fair dealing with respect to its preemptive purchase rights. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471-473 (1991) (every contract in Massachusetts is subject to an implied covenant of good faith and fair dealing); *Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354, 362 n.9 (1990); *Kerrigan* v. *Boston,* 361 Mass. 24, 33 (1972). Parties to a contract are obligated to deal honestly and in good faith in both the performance and enforcement of the terms of their contract, and Hawthorne's did not act honestly or in good faith in its dealings concerning its option rights. See Restatement of Contracts (Second) § 205 comment a (1979).

It cannot be said that Pratt has suffered any significant loss due to bad faith conduct of Hawthorne's, since Halstrom purchased one-half of Pratt's interest and the value of his retained interest has dramatically increased. However, to allow Hawthorne's now to exercise its option, even at an increased price, or require Pratt to pay damages on the ground that the option held by Hawthorne's remains legally valid would certainly harm Pratt. Even if we were to conclude that the option was not terminated by the sale to the 100 Warrenton Trust, which we do not, a party that has committed a breach of the implied covenant of good faith and fair dealing may not obtain relief based on the effects of its own breach. See Restatement of Contracts (Second) § 369 comment a (1979). As we have indicated, unconscionable conduct of Hawthorne's with respect to the Lewis offer directly relates to the resulting sale to the 100 Warrenton Trust, and, therefore, the breach by Hawthorne's materially relates to its current claim for damages. The judge correctly determined that Hawthorne's was not entitled to relief by way of damages on the lease itself.

*Judgment affirmed.*