Smith, Herman J., J.
I. INTRODUCTION
On September 30, 2005, Plaintiff, BBNT Solutions, LLC (“BBNT”), commenced the present action against Defendant, 625 Concord, Inc. (“Concord”), for specific performance of an option to purchase (“Purchase Option”) , breach of the implied covenant of good faith and fair dealing, and for violation of G.L.c. 93A in connection with a written lease agreement between Concord and BBNT (“the Lease”) for a commercial property located at 10 Moulton Street, Cambridge, Massachusetts (“the Property”). Thereafter, Concord filed various counterclaims against BBNT as well as a third-party complaint against Intercontinental Fund III 20 Moulton Street, LLC (“Intercontinental”). Concord is the owner and landlord of the Property and BBNT is the tenant under the Lease. Intercontinental is BBNTs purported nominee to receive title to the Property. The parties are now before this court on BBNTs motion for partial summary judgment and separate and final judgment on its claim for specific performance. For the following reasons, BBNTs motion is ALLOWED.
II. BACKGROUND
The undisputed material facts, as established by the summary judgment record and taken in a light most favorable to the non-moving party, are as follows. Concord is the landlord of the Property under a lease dated October 18, 1973 (“the Lease”) originally executed between BoltBeranek and Newman, Inc. (“BBN”), as tenant, and Robert Jones and K. George Najarian, as landlord. In 1977, as Robert Jones and K. George Najarian’s successor-in-interest, Concord assumed ownership of the Property. On April 26, 2000, BBN assigned the Lease to BBNT pursuant to written agreement, under which BBNT agreed to be bound by terms of the Lease.
The Lease provides that BBNT, as tenant, pay all rent, insurance, taxes and expenses associated with its occupancy of the Property. The Lease further provides that BBNT, at its own cost and expense, maintain and keep the Property in good condition and repair during its term of lease. The Lease also permits BBNT to extend its term of lease on the same terms and conditions thereto for an additional term of years upon written notice to Concord.
In the event that Concord receives an offer to purchase the Property during the term of lease, Paragraph 26 of the Lease accords BBNT the right to purchase the Property on the same terms as the offer before Concord can consummate sale of the Property. Independent of that right, Paragraph 26 of the Lease grants BBNT the option to purchase the Property (“Purchase Option”) at any time. The Purchase Option requires the following to exercise the option:
*733 The Tenant shall have the option, exercisable by giving written notice to the Landlord at any time after December 31, 1989, during the initial and any renewal term of this lease, to purchase the lease premises and all improvements thereto at an option price . . . Such written notice shall specify a date within 90 days thereafter when closing shall occur.
The Purchase Option further sets out the following procedure by which the option price is to be calculated:
The “option price” shall be the higher of (a) the Landlord’s Percentage (as defined with respect to rent during the extension of terms of the fair market value, as of the date of the exercise of the option, of the lease premises (without giving effect to this lease), or (b) the Rental Factor ... reduced by any amount paid by the Tenant prior to the closing date as fixed annual rental during the initial term hereof which are attributable, in the computation of such fixed annual rental as hereinabove described, to amortization of said Rental Factor. If Landlord and Tenant are unable to agree on the option price it shall be determined by appraisal, the Landlord and Tenant each appointing one qualified real estate appraiser who shall in turn jointly choose a third. The three appraisers thus named shall act promptly and the agreement of any two as to the proper option price shall be binding upon the parties hereto.
According to the Lease, the foregoing provisions, as with all covenants, agreements, provisions, conditions and obligations contained in the Lease, shall run with the land and shall extend to, bind and inure to the benefit of Concord and its heirs, successors and assigns as well as to the benefit of BBNT and its successors and assigns. However, under the Lease, BBNT may not sell, assign or mortgage the Lease without the prior written consent of Concord. The Lease is terminable by Concord if BBNT defaults in the performance or adherence of the provisions of the Lease and fails to cure such default within thirty days after receipt of notice of such default. Upon termination of the Lease, BBNT shall surrender to Concord the Property in good order and condition.
On March 26, 2004, in connection with Intercontinental’s desire to purchase from and lease back to BBNT the Property, BBNT entered into an agreement with Intercontinental titled “Agreement With Respect To Right Of First Refusal And Option To Purchase” (“the I.F. Ill Purchase Option Agreement”) wherein BBNT agreed that Intercontinental shall have the right to compel BBNT to exercise the Purchase Option pursuant to the terms of the Lease and, in the process, BBNT shall name Intercontinental its nominee to take title to the Property. Although aware that BBNT had designated Intercontinental its nominee, Concord did not learn of the I.F. Ill Purchase Option Agreement until August 2005.
On June 28, 2004, by written notice to Concord, BBNT extended its lease of the Property for an additional five years, with the renewal term commencing January 1, 2005 and terminating December 31, 2009. On January 21, 2005, at the direction of Intercontinental, BBNT notified Concord by letter that it intended to exercise the Purchase Option. That letter specified April 7, 2005 as the closing date for the purchase of the Property, and contained BBNTs request that it be permitted to designate Intercontinental as its nominee to take title to the Property. On January 25, 2005, via e-mail, Allan Jones (“Jones”), President of Concord, acknowledged the proposed closing date and expressed his willingness to transfer title to Intercontinental at BBNTs request. Thereafter, Tom Taranto (‘Taranto”), Director of Asset Management for Intercontinental, contacted Jones to ask that Concord deal with Intercontinental in the purchase of the Property exclusive of BBNT. Jones then contacted Ed Campbell (“Campbell”), Vice President of Operations for BBNT, to communicate his disinclination to deal directly with Intercontinental in the Purchase Option process. Jones further stated to Campbell that he was aware of BBNTs involvement with Intercontinental and that BBNT remained amenable to the transfer of title to Intercontinental as BBNTs nominee. That same day, Jones engaged in a telephone conversation with David Lintz (“Lintz”), General Counsel for BBNT, during which Jones reiterated his unwillingness to deal with Intercontinental in connection with BBNTs exercise of the Purchase Option.
On March 1, 2005, Jones sent to Lintz an e-mail, in which Jones inquired into BBNTs efforts to propose a fair market value for the Property. Lintz subsequently forwarded that e-mail to Jones and requested instruction from Intercontinental as to how BBNT should respond. That same day, BBNT received from Intercontinental a facsimile representing Intercontinental’s determination of the future fair market rental rates for the Property with respect to Intercontinental’s purchase of the Property and leaseback to BBNT. BBNT challenged Intercontinental’s rates.
On March 16, 2005, Lintz contacted Jones to inform him that BBNT had not yet formulated an option price due to the disagreement between BBNT and Intercontinental as to future rental rates. In a followup e-mail, Jones repeated that Concord considered BBNT the only party to the Purchase Option process. Jones also conveyed his concern that BBNTs relationship with Intercontinental had become problematic and disruptive to the Purchase Option process.
On March 22, 2005, in anticipation of the Lease-designated appraisal process, Intercontinental contacted Webster Collins (“Collins”), a certified real estate appraiser, regarding the potential valuation of the Property. On March 25, 2005, Jones attended a meeting with representatives from Intercontinental, including Taranto, during which Intercontinental informed Jones that it valued the Property at $5-6 million.[3] Jones disputed that figure and emphasized that Concord intended to undertake the Purchase Option process only with BBNT. Thereafter, Jones sent to Taranto *734 an e-mail, in which Jones further expressed his disagreement with Intercontinental’s valuation of the Property and underscored that Concord would not deal with Intercontinental. That same day Jones emailed Lintz and Campbell to make known his wariness of BBNTs relationship with Intercontinental.
On the morning of March 29, 2005, Taranto and Campbell engaged in a series of e-mails, the subject of which concerned the option price and the Purchase Option process. Taranto informed Campbell that Intercontinental would provide BBNT with a purchase option price for BBNT to propose to Concord. Both Taranto and Campbell acknowledged that Concord likely would reject the proposed option price, in turn triggering the appraisal process Indeed, during their e-mail exchange, Taranto commented to Campbell that Intercontinental desired Collins as the appraiser for BBNT. Later that same day, Intercontinental instructed BBNT to offer Concord an option price of $4.53 million. Intercontinental further instructed BBNT to advise Concord that BBNT wished to appoint Collins as its real estate appraiser if Concord refused to accept the proposed option price.
On March 30, 2005, through an e-mail, Lintz proposed to Jones and Concord an option price of $4.53 million and, in the event that Concord disagreed with that price, announced BBNTs intention to retain Collins as its real estate appraiser consistent with the appraisal process delineated in the Lease.[4] Thereafter, Jones, on behalf of Concord, rejected BBNTs offer and selected Randall Lee Harwood (“Harwood”) of Cushman & Wake-field as its appraiser. Pursuant to the appraisal procedure, Collins and Harwood then decided upon Emmet Logue (“Logue”) of Hunneman Appraisal & Consulting Company as the third appraiser.[5]
On April 14, 2005, Jones wrote to Lintz a letter wherein Jones again declared that Concord had no obligation to deal with Intercontinental and would not do so during the appraisal process. Jones also intimated his belief that BBNT may have violated the Lease through its activities with Intercontinental.
At some point in May 2005, the three appraisers arranged a walk-through of the Property. BBNT and Intercontinental requested that Taranto participate therein. However, Jones objected to Taranto’s participation. On May 16, 2005, Lintz telephoned Jones to insist that Concord allow Taranto to participate in the appraisal tour of the Property. Again, Jones indicated that Concord would not permit the walk-through of the Property if Taranto were present. Shortly thereafter, Jones sent to Lintz an e-mail, in which Jones stated his concern that the appraisal process had been delayed because of Intercontinental’s actions. In addition, Jones articulated his willingness to review any documents that demonstrated the assignment of the Lease and Purchase Option to Intercontinental.
On May 17, 2005, Lintz e-mailed Jones to deny that BBNT had forestalled the appraisal process and to inform Jones that Intercontinental held neither the Lease nor the Purchase Option in assignment. Ultimately, Intercontinental acquiesced not to have Taranto participate in the walk-though of the Property. On May 25, 2005, the three appraisers toured the Property. Subsequently, the appraisers agreed to exchange property value calculations by the end of June 2005 and then meet to agree on an option price for the Property shortly after July 4, 2005.
During the appraisal process, the appraisers discussed and, eventually, disagreed on the valuation methodology to be used with respect to the condition of the Property. On August 9, 2005, the appraisers met to resolve that dispute. At that meeting, in light of the “without giving effect to this lease” language in Paragraph 26 of the Lease, Collins opined that the proper methodology should incorporate estimated repair costs to the Property and, as a result, such costs should be deducted from the fair market value of the Property to establish the value of the Property in “as is” condition. Thereafter, at some time during the appraisal process, Collins left Logue a voice message, in which Collins conveyed his belief that the valuation methodology used by the appraisers to that point had been erroneous because it valued the Property in “as repaired” condition as opposed to “as is” condition. Collins further suggested that the resolution of such a valuation may result in Intercontinental commencing suit against Logue and Harwood for noncompliance with the proper appraisal procedures. Subsequently, Logue contacted Katherine Stockman (“Stockman”) of BBNT to discuss the progress of the appraisal process. During that conversation, Logue communicated to Stockman the substance of the Collins’ voice message. Logue mentioned to Stockman that he did not credit Collins’ statements and that the voice message would not influence his final valuation. However, after receipt of the voice message, Logue sought the advice of legal counsel.
On August 25, 2005, Jones, on behalf of Concord, sent to BBNT a reservation of rights letter asserting that BBNT had breached its obligations under the Lease by assigning the Purchase Option to Intercontinental without Concord’s prior consent and by delaying the appraisal process in passing of the closing date and that, as a result, BBNT no longer held the Purchase Option. Concord further stated therein that it would not share the contents of the letter with the appraisers so that they may complete the appraisal process unmolested. In response thereto, on August 30, 2005, Lintz, by letter to Jones, rejected Concord’s assertions and explained that BBNT had neither assigned the Purchase Option to Intercontinental nor obstructed the appraisal process.
On September 1, 2005, after first learning of the I.F. Ill Purchase Option Agreement, Jones sent to Lintz a letter of formal notice claiming that the actions of BBNT in connection with the alleged assignment of the Purchase Option to Intercontinental as well as BBNTs purported interference with the appraisal process amounted to a material breach of the Lease, as a result of which the *735 Lease and the appraisal process had been rendered void and the Purchase Option forfeit. On September 9, 2005, legal counsel for BBNT sent to Intercontinental notice of Concord’s claims against BBNT and requested Intercontinental indemnify BBNT in the defense of such claims pursuant to the I.F. IE Purchase Option Agreement.
On September 30, 2005, BBNT commenced this action against Concord for specific performance of the Purchase Option. On October 7, 2005, Collins and Logue established an option price of $9,534,650 for the Property, for which that amount reflects the “as is” value of the Property. Concord has refused to recognize and be bound by that figure. Concord also has forwarded to BBNT an additional notice of default and material breach of the Lease due to BBNTs alleged failure to repair and maintain the Property in good condition as required under the Lease.
III. DISCUSSION
A. Standard for Summary Judgment
Summary judgment shall be granted only where there are no issues of material facts in dispute and where the summary judgment record entitles the moving party to judgment as a matter of law Cassesso v. Comm’r of Corr., 890 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party. G.S. Enters, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). The moving party bears the burden of affirmatively demonstrating the absence of a triable factual issue and of showing that it is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Once the moving parly demonstrates the absence of a triable issue, the non-moving party must set forth specific facts establishing the existence of a genuine dispute as to a material fact. Cornellas v. Viveiros, 410 Mass. 314, 317 (1991). The court should deny a motion for summary judgment when the nonmoving party presents evidence of genuine issues of fact entitling him to a trial. Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 556 (1976).
B. Assignment
Concord asserts that the I.F. Ill Purchase Option Agreement entered into by BBNT and Intercontinental constitutes an assignment of the Purchase Option in violation of the provisions of the Lease. BBNT maintains that it made no such assignment to Intercontinental and that the I.F. Ill Purchase Option Agreement is a contract between Intercontinental and BBNT whereby Intercontinental bargained for the right to require BBNT to exercise the Purchase Option pursuant to the terms of the Lease. Therefore, the focus of this court is on the meaning of the I.F. Ill Purchase Option Agreement.
An assignment is an actual transfer in whole or in part of the interest in or rights of the assignor to a designated assignee. Chartrand v. Chartrand, 295 Mass. 293, 296 (1936); H.P. Hood & Sons v. Perry, 248 Mass. 350, 352 (1924); Black’s Law Dictionary (6th Ed. Rev. 1991) 79. A tenant’s interest in and rights under a lease may be assigned in the absence of provisions in the lease expressly prohibiting such a transfer. Valley Oil Co. v. Barberian, 344 Mass. 759, 759 (1962); Am Employers’ Ins. Co. v. City Of Medford, 88 Mass.App.Ct. 18, 22 (1995). Whether an assignment actually occurred is a question of law for the court. Gow v. Buckminster Hotel, Inc., 336 Mass. 606, 607 (1958).
The question of whether an assignment took place in this case rests on the nature of the I.F. Ill Purchase Option Agreement between BBNT and Intercontinental. Therefore, this court must look to the purpose of the I.F. Ill Purchase Option Agreement to determine whether an assignment occurred.[6] In so doing, this court recognizes that the language of the I.F. Ill Purchase Option Agreement shall decide the meaning of the contract. Hawthorne’s Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 211 (1993).
A plain and unambiguous contract must be construed according to the plain language of its terms and in such a way as to give it effect as a rational business instrument. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992); Louis Stoico, Inc. v. Colonial Development Corp., 369 Mass. 898, 902 (1976). Where the language used in a contract expresses a plain meaning applicable to the particular transaction “(t]he contract cannot be construed as meaning something different from what the parties intended as expressed by the language they saw fit to employ.” Freelander v. G.&K. Realty Corp., 357 Mass. 512, 516 (1970); Farber v. Mutual Life Ins. Co., 250 Mass. 250, 253 (1924). Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condo. Trust v. Aetna Cas & Surety Co., 433 Mass. 373, 376 (2001).
In this case, the terms of the I.F. Ill Purchase Option Agreement between Intercontinental and BBNT are clear and unambiguous. Although Concord asserts that the I.F. Ill Purchase Option Agreement constitutes an assignment of the Purchase Option, a plain reading of the terms of the I.F. Ill Purchase Option Agreement, construing the language used therein in its usual and ordinary sense, does not support such a conclusion.
The I.F. Ill Purchase Option Agreement embodies a personal agreement between Intercontinental and BBNT, under which Intercontinental and BBNT established a discrete contractual relationship. The language used in the I.F. Ill Purchase Option Agreement clearly defines the bargained-for rights of the parties thereto created by that contract.
By its plain terms, the I.F. III Purchase Option Agreement contemplates that Intercontinental and BBNT agree that BBNT shall exercise the Purchase Agreement under the Lease, but that Intercontinental may instruct it when to do so. Notwithstanding that under that agreement BBNT surrenders its discretion to exercise the Purchase Option, the practical effect of such an arrange *736 ment is not that BBNT transferred to Intercontinental its interest in and rights to the Purchase Option, but rather BBNT remains the holder of the Purchase Option in consideration of Intercontinental’s right to require that BBNT exercise the Purchase Option pursuant to the terms of the Lease. Indeed, the I.F. Ill Purchase Option Agreement makes clear that BBNT, and not Intercontinental, is to exercise the Purchase Option. Furthermore, the I.F. Ill Purchase Option Agreement contains no language a practical reading of which would demonstrate that BBNT transferred to Intercontinental its right to the Purchase Option. See Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 701 (1964). If Intercontinental and BBNT had desired to effectuate such a transfer, the parties could have specifically included such language in the I.F. Ill Purchase Option Agreement. However, absent such a provision and in light of the language employed in the I.F. Ill Purchase Option Agreement, this court finds that there has been no assignment.
C. Specific Performance
BBNT seeks to invoke the equitable doctrine of specific performance to enforce the Purchase Option. Concord argues that BBNT’s failure to obtain the written consent of Concord prior to the assignment of the Purchase Option to Intercontinental represents a material breach of the Lease, as a result of which Concord need not perform on the Purchase Option. Concord further claims that BBNTs conduct prior to and after it exercised the Purchase Option precludes BBNT from specific performance under the equitable theory of “unclean hands.” However, upon examination of the record, this court finds no reason to prevent the carrying out of the Purchase Option under the circumstances of this case.
The applicability of the doctrine of specific performance is well established in this Commonwealth in the context of agreements for the purchase and sale of real property. McCarthy v. Tobin, 429 Mass. 84, 89 (1999); Greenfield Country Estates Tenants Ass’n., Inc. v. Deep, 423 Mass. 81, 88 (1996). It follows that “specific performance is a proper remedy to enforce a valid option to purchase real property.” Greenfield Country Estates Tenants Ass’n., Inc., 423 Mass. at 89. The question of whether to grant specific performance is a matter within the sound discretion of the court. Raynor v. Russell 353 Mass. 366, 367 (1967). However, specific performance, an equitable remedy, should not be granted in those circumstances in which it would impose an undue hardship on one party or allow the other party to obtain an inequitable advantage. Greenfield Country Estates Tenants Ass’n., Inc., 423 Mass. at 90.
Contrary to Concord’s assertion that BBNT materially breached the lease by violating the restriction on assignment in the Lease and, thus, lost its rights to the Purchase Option, this Court finds that BBNT held a valid option to purchase under the Lease at the time it exercised that option. As discussed hereinabove, the I.F. Ill Purchase Option Agreement executed between Intercontinental and BBNT is not an assignment for which BBNT needed Concord’s prior written consent. However, even assuming that the I.F. Ill Purchase Option Agreement constitutes an assignment, this Court finds that an assignment of the Purchase Option would not require the prior consent of Concord under the Lease.
A contractual right can be assigned unless such assignment is expressly forbidden by the terms of the contract. Am. Employers’ Ins. Co., 38 Mass.App.Ct. at 22. Here, the restriction on assignment in the Lease only prohibits BBNT from assigning “this lease” without the prior written consent of Concord. Therefore, under the Lease, keeping in mind that a contract is to be construed to give reasonable and practical effect to each of its provisions, the object of the non-assignment provision is BBNTs property interest in the Lease, and not any contractual rights arising therefrom. See Restatement (Second) of Contracts, §322(1) (1981). Accordingly, the Purchase Option being a contractual right, and not a property interest, the Lease would neither require BBNT to obtain Concord’s permission to assign the Purchase Option nor would preclude such an assignment. See Cornell-Andrews Smelting Co. v. Boston & Providence R.R., 209 Mass. 298, 307 (1911).
Furthermore, upon a plain reading of the Lease, any other alleged breaches of the Lease by BBNT would not divest BBNT of its right to exercise the Purchase Option because, when BBNT chose to exercise the Purchase Option, BBNT was the lawful tenant of the Property and the Lease remained in force. In the event that there has been breach of any conditions or covenants of the Lease, Section 17 of the Lease makes provision for the termination of the Lease after the tenant has failed to cure the breach within thirty days of written notice of such breach. On September 1, 2005, Concord sent to BBNT written notice of its alleged breach of the Lease, after which BBNT had thirty days to cure the breach. Notice by BBNT of exercise of the Purchase Option was given on January 21,2005. Since Concord did not provide written notice of breach until September 1, 2005, nearly seven months after BBNT elected to exercise the Purchase Option, BBNT was the lawful holder of the Purchase Option at the time it exercised that option. Leisure Sports Inv. Corp. v. Riverside Enterprises, Inc., 7 Mass.App.Ct. 489, 492 (1979). However, to obtain specific performance of the Purchase Option, BBNT must have properly exercised that option in conformily with the terms of the Purchase Option provision.
The language of an option provision determines the manner in which an option may be effectively exercised, and such language is to be strictly construed. Roberts-Neustatder Furs, Inc. v. Simon, 17 Mass.App.Ct. 262, 265 (1983); Westinghouse Bdcst. Co. v. New England Patriots Football Club, Inc., 10 Mass.App.Ct. 70, 73 (1980). Once an option to pur *737 chase is effectively exercised, it “ripens into a bilateral purchase and sale contract which is binding on both parties and can be enforced by specific performance.” Roberts-Neustatder Furs, Inc., 17 Mass.App.Ct. at 265.
In this case, the Purchase Option provides that the tenant may exercise that option by giving written notice to the landlord “at any time after December 31, 1989, during the initial and any renewal term of lease.” The Purchase Option further establishes a time frame for closing, which is to be set by the tenant within ninety days of written notice to the landlord of the exercise of the Purchase Option. However, if the tenant and landlord cannot agree on a suitable option price, such a price shall promptly be determined by three qualified real estate appraisers, two of whom must agree on a proper option price to bind the parties thereto. Therefore, upon a strict reading of the Purchase Option provision, exercise of the Purchase Option is a matter of BBNT giving notice to Concord in the manner and within the period of time specified in that provision.
On January 21, 2005, BBNT sent to Concord written notice of its intent to exercise the Purchase Option, in which BBNT specified April 7, 2005 as the closing date. By doing so, BBNT exercised the Purchase Option in strict compliance with its terms. As a result, assuming that the purpose of the exercise of the Purchase Option is to effectuate the conveyance of the Property, the exercise of that option created a “bilateral purchase and sale contract” to be performed either upon agreement of Concord and BBNT on an option price or at the conclusion of the appraisal period.[7]
Because neither Concord nor BBNT could arrive at a mutually acceptable option price, both parties yielded to the appraisal process as set forth in the Purchase Option. That process concluded on October 7, 2005, at which point BBNT became obligated to pay Concord the established option price and, correspondingly, Concord became obligated to convey the Property. Therefore, because Concord has failed to perform its obligation, BBNT would be entitled to specific performance of the Purchase Option. However, there remains Concord’s contention that BBNT engaged in unfair conduct during the Purchase Option process, in light of which this court may refuse to grant specific performance. See Hawthorne’s, Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 208 (1993).
Specific performance is an equitable remedy which should not be granted when the requesting party has engaged in conduct “savored with injustice touching the transaction.” Economy Grocery Stores Corp. v. McMenamy, 290 Mass 549, 552 (1935). “ ‘[T]he doors of equity’ are closed ‘to one tainted with inequitableness or bad faith relative to the matter in which he [or she] seeks relief, however improper may have been the behavior of the other party.” Fid. Management & Research Co. v. Ostrander, 40 Mass.App.Ct. 195, 200 (1996). “(W]hile ‘equity does not demand that its suitors shall have led blameless lives’ ... as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.” Precision Instrument Mfg. Co. v. Auto. Maintenance Mach. Co., 324 U.S. 806, 814-15 (1945). In essence, the party seeking specific performance must come to the court with “clean hands.” Fidelity Mgmt. & Research Co., 40 Mass.App.Ct. at 200.
Concord alleges that BBNT misrepresented the true nature of its relationship with Intercontinental and, as a result thereof, tainted the Purchase Option process. Specifically, Concord asserts that BBNT deceived Concord about the effect of the I.F. Ill Purchase Option Agreement, refused to negotiate an option price in good faith, and corrupted the appraisal process through misconduct and threats.
As mentioned earlier herein, the I.F. Ill Purchase Option Agreement entered into by BBNT and Intercontinental does not amount to an assignment. Rather, the I.F. Ill Purchase Option Agreement exists as a contract between BBNT and Intercontinental separate and distinct from the Lease and its provisions. Therefore, BBNTS representations that there was no assignment to Intercontinental did not constitute deception or bad faith. Nor does the fact that BBNT failed to provide to Concord the I.F. Ill Purchase Option Agreement represent an attempt to deceive Concord. Indeed, BBNT was under ho obligation, under the Lease or otherwise, to disclose to Concord the existence of that contract.
BBNT did disclose, however, Intercontinental’s interest in and desire to take title to the Property as BBNTs nominee. This disclosure accurately reflected the relationship between BBNT and Intercontinental with respect to the Purchase Option. There is nothing in the Lease or the Purchase Option to prohibit BBNT from agreeing to sell or pass title to the Property to Intercontinental or any other purchaser once BBNT exercised the Purchase Option. Therefore, whether BBNT exercised the Purchase Option to facilitate the sale of the Property to Intercontinental was of no concern to Concord, and Concord possessed sufficient information to proceed in good faith in the Purchase Option process.
Furthermore, although the record reveals that BBNT acted at the direction of Intercontinental, the fact that BBNT offered to Concord an option price which may have been below the fair market value of the Property is not enough for this court to refuse BBNTs claim for specific performance. Even if BBNTs motivation behind that offer was the desire to activate the appraisal process for the benefit of Intercontinental, there is no evidence that BBNT intended to advance some fraudulent scheme against Concord or cause Concord to suffer inequity during the Purchase Option process. Given that BBNT and Concord represent opposite sides of the Purchase Option, it is not surprising that BBNT presented a figure less than that which Concord considered the true value of the Property. Concord remained free to reject the option price proposed by BBNT, after which the parties invoked the appraisal process to establish the value of the Property.
*738 Once commenced, the appraisal process proceeded according to the terms of the Purchase Option provision in spite of the fact that Intercontinental interposed itself in the conduct of the appraisal process, which may have created less than ideal circumstances. The record fails to demonstrate that BBNT and, to the same extent, Intercontinental as the prospective purchaser, prejudiced or interfered with that process to the disadvantage of Concord. In particular, the evidence does not show that the alleged threat of Collins made to Logue influenced the outcome of the appraisal process in favor of BBNT. Indeed, the evidence suggests to the contrary, that Logue did not decide his appraisal as a result of any perceived threat by Collins.
The “threat,” such as it was, amounted to no more than telling Logue of the potential legal consequences of valuing the Property by a method not permitted by the lease. In his voice message to Logue, Collins did not suggest that Logue would face legal action if he did not provide an option price desirable to BBNT or Intercontinental. Instead, Collins expressed his ongoing concern that the appraisers had been using a methodology inconsistent with the Lease and the option price calculation described therein, the consequence of which may be litigation. Thus, the record does not support Concord’s allegation that a threat was in fact made.
In conclusion, this court finds that BBNT has complied with the provisions of the Purchase Option. Therefore, Concord should not now be excused from its obligations under the Purchase Option because it is dissatisfied with the final option price.
IV.FURTHER DISCOVERY
Concord claims that summary judgment at this stage would be premature because insufficient discovery has been conducted. The only further discovery sought by Concord relates to evidence confirming that the I.F. Ill Purchase Option Agreement is an assignment in violation of the Lease, documents detailing the scope of the relationship between Intercontinental and BBNT, and records of Logue concerning the alleged threat made to him by Collins. However, this Court fails to see the necessity of such additional discovery.
Although Concord has provided specific facts in support of its allegations against BBNT, such facts fail to demonstrate the type of inequity to warrant denial of specific performance in this case. The decision to grant or deny specific performance is a matter left to the discretion of this court. In evaluating the appropriateness of specific performance, this court need not look beyond the I.F. Ill Purchase Option Agreement to determine, as a matter of law, whether an assignment had occurred in violation of the Lease, and, as previously discussed, this Court has concluded that there, has been no such assignment. Further elaboration on the business relationship between Intercontinental and BBNT would not change the fact that BBNT effectively exercised the Purchase Option. Furthermore, the record reveals that Logue has specifically testified that he was not induced by Collins to misconstrue or change his appraisal of the Property in favor of BBNT and Intercontinental. Consequently, this court believes that the record has been developed sufficiently to allow for the proper disposition of this case and for summary judgment to enter.
V.MOTION TO STRIKE AFFIDAVIT
BBNT’S Motion to Strike Affidavit of Allen Jones is DENIED.
VI.ORDER
For the foregoing reasons, it is hereby ORDERED that BBNT Solutions, LLC’s Motion For Partial Summary Judgment on its claim for specific performance is ALLOWED. Accordingly, final judgment for specific performance of the option to purchase provision in Paragraph 26 of the commercial lease, as described in this Memorandum of Decision, shall enter in favor of BBNT Solutions, LLC. Further, this Court ORDERS that Defendant 625 Concord, Inc. shall forthwith convey the leased premises, located at 10 Moulton Street, Cambridge, MA, for the price previously determined by two of the three appraisers, as described in this Memorandum of Decision, to plaintiff BBNT Solutions, LLC on or before thirty days from the entry date of this judgment. BBNTs Motion to Strike Affidavit of Allen Jones is DENIED.

 In May 2005, BBNTs internal market research identified the value of the Property as between $10.8 million and $14.2 million.

 Collins was not officially retained by BBNT until October 2, 2005. Invoices for his work were forwarded by BBNT to Intercontinental for payment.

 Logue initially believed that he worked for Intercontinental, but was later disabused of this notion by Taranto.

 Although Concord has presented the deposition testimony of Logue in support of its contention that the I.F. Ill Purchase Option Agreement constitutes an unauthorized assignment, such testimony based on hearsay is unpersuasive.

 While recognizing that time is of the essence with respect to the exercise of an option, this court finds that a strict reading of the terms of the Purchase Option indicates that the specified closing date relates only to the time within which the parties to the Lease must agree to an option price. In contrast, the language of the Purchase Option directs that the appraisal process be conducted in a prompt manner. This distinction leads this court to believe that the appraisal process is not to be temporally constrained by the closing date, but rather conducted in a reasonable and timely fashion. This construction of that provision would take into account the further need of the parties to attend to the details required by the appraisal process in the event that the parties disagreed as to the option pnce. Indeed, the parties’ actions confirm such a construction insofar as both parties acted in furtherance of and allowed the appraisal process to continue past the closing date. See Town of Southborough v. Boston & Worcester St. Ry. Co., 250 Mass. 234, 239 (1924).