van Gestel, J.
This matter is before the Court on the defendants’ motion to dismiss the complaint pursuant to Mass.R.Civ.P. Rule 12(b)(6). The plaintiff, Jeffrey D. Chokel (“Chokel”), has sued Genzyme Corporation and each member of its Board of Directors (collectively “Genzyme” or as appropriate “the “Directors”) , in connection with a decision by the Directors to exercise a right conferred by Genzyme’s Articles of Organization to exchange certain Biosurgery Division ’’tracking" shares for Genzyme General Division stock.
BACKGROUND
The facts that follow are taken from the complaint and, in some instances, from the documents “incorporated in the complaint” such as Genzyme’s Articles of Organization. Harhen v. Brown, 431 Mass. 838, 839-40 (2000).
Genzyme is a global biotechnology corporation organized under the laws of Massachusetts. Since 1994, Genzyme’s capital structure has included series of common stock designed to “track” the performance of particular business divisions, rather than the company as a whole. Since the end of 2000, Genzyme has had outstanding “tracking” stock for each of its General Division, its Biosurgeiy Division, and its Molecular Oncology Division. Each of those “tracking” stocks was registered under the Securities Exchange Act of 1934, traded over-the-counter, and quoted on the NASDAQ National Market System.
Although Genzyme’s “tracking” stocks were designed and intended to reflect the financial performance of the discrete division to which each corresponded, the divisions were not separate legal entities. Rather, each “tracking” stock is a series of the common stock of Genzyme Corporation. Holders of any series of “tracking” stock were stockholders of a single corporation and faced the risks of an investment in Genzyme Corporation. They did not own an undivided or fractional interest in the assets or business of the division whose performance the stocks were designed to “track.”
As required in its Articles of Organization (“Articles”), Genzyme allocated programs, products, assets and liabilities among its divisions, but the corporation, not the divisions, continued to own all of the divisional assets and was responsible for all of their liabilities. The “tracking” stocks “tracked” the performance of the divisions with which they were associated through the publication by Genzyme of financial statements for each division, and through provisions in the Articles governing distributions to holders of each series of Genzyme “tracking” stock.
On May 8, 2003, Genzyme announced that its Directors had determined to eliminate its “tracking” stock capital structure. Genzyme announced that the Directors had determined to exercise an Optional Exchange Provision (the “OEP”) in the Articles. The OEP affords the Directors the ability — at any time and in their sole discretion — to exchange any “tracking” stock for cash or shares of Genzyme General Division stock, or a combination of the two.
The language of the Articles permitting the exercise of the option read:
E. GENZYME BIOSURGERY DIVISION COMMON STOCK
6. Exchange or Redemption of [Genzyme Biosurgery Division] Stock.
Shares of [Genzyme Biosurgeiy Division] stock are subject to exchange or redemption upon the terms and conditions set forth below:
(a) Optional Exchange of [Genzyme Biosurgeiy Division] Stock.
*108 (1) The Board of Directors may at any time . . . declare that each of the outstanding shares of [Genzyme Biosurgeiy Division] Stock shall be exchanged, on an Exchange Date, as determined by the Board of Directors, for (a) a number of fully paid and nonassessable shares of [Genzyme General Division] Stock (calculated to the nearest five decimal places) equal to (1) 130% of the Fair Market Value of one share of the [Genzyme Biosurgeiy Division] Stock (the “GBS Optional Exchange Amount”) as of the date of the first public announcement by the Corporation (the “GBS Optional Exchange Announcement Date”) of such exchange divided by (2) the Fair Market Value of one share of [Genzyme General Division] Stock as of such GBS Optional Exchange Announcement Date or (b) cash equal to the GBS Optional Exchange Amount, or (c) any combination of Genzyme General Division Stock and cash equal to the GBS Optional Exchange Amount as determined by the Board of Directors.
The Articles separately defined “Fair Market Value” for these purposes as follows:
F. GENERAL PROVISIONS REGARDING THE COMMON STOCK
7. Definitions.
(f) “Fair Market Value” shall mean
(1) as to shares of any series of stock of the Corporation as of any date, the average of the daily Closing Prices for the 20 consecutive Business Days commencing on the 30th Business Day prior to such date, except that in the event such Closing Prices are unavailable, Fair Market Value shall be determined by the Board of Directors.
As a result of the Directors’ decision to exercise the OEP, on June 30, 2003, all shares of Biosurgeiy Division “tracking” stock were exchanged for shares of Genzyme General Division stock according to the foregoing provisions of the Articles.
Chokel argues two separate theories for recovery, respectively alleging breach of the implied covenant of good faith and fair dealing and the breach of fiduciary duty. Each of these claims derives from Chokel’s allegation that the timing of the Directors’ approval of the share exchange was unfair.
Chokel’s complaint alleges that, at some point “prior to February 4, 2003,” in recognition that the Biosurgery Division’s market price did not reflect its “true” fair market value, the Directors “began to plan to have Genzyme acquire the outstanding Biosurgery Stock” in an exchange that was “based upon the deflated market price” for the “tracking” stock shares.
Chokel’s complaint acknowledges that the Directors created a special Capital Structure Committee in Februaiy 2003, and that the Committee retained independent financial advisers in March 2003 to opine on whether the exercise of the OEP would be fair to the holders of the “tracking” stock from a financial point of view. Chokel’s complaint nevertheless contends that the Directors selected May 8, 2003, as the date to announce the exchange because the 20-trad-ing-day measuring period to calculate the exchange ratio would only include five days after the announcement by Genzyme of the “highly favorable” Biosurgeiy Division earnings announcement on April 16, 2003, which provoked an increase in the market price for Biosurgeiy Division shares.
Chokel’s complaint alleges that the Directors timed the exercise of the OEP to take advantage of the “depressed” price of the “tracking” stock, and accelerated the announcement once the market price began to increase. He alleges that the exchange was timed to occur when “Biosurgeiy stock was substantially undervalued relative to its intrinsic worth and future prospects.”
Chokel’s complaint further alleges that the Directors “directly benefitted” from the timing of the exchange because they each disproportionately owned more Genzyme General Division stock than Biosurgeiy Division “tracking” shares.
DISCUSSION
A Rule 12(b)(6) motion admits all well-pleaded allegations of the complaint, and the Court must accept as true such inferences as may be drawn in Chokel’s favor. Blank v. Chelmsford Ob/Gyn. P.C., 420 Mass. 404, 407 (1995); Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630 (1999). Of course, conclusions of law from the facts alleged are open for review on a Rule 12(b)(6) motion. The complaint here, however, is sufficient unless it shows beyond doubt that no provable set of facts would entitle Chokel and the class he purports to represent to relief. Warner-Lambert Company v. Execuquest Corporation, 427 Mass. 46, 47 (1998); Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992). Chokel bears a “relatively light burden,” Warner-Lambert Co., supra 427 Mass, at 47, and must be given the benefit of any doubts. Kipp v. Keuker, 7 Mass.App.Ct. 206, 210 (1979). These are “generous principles,” and the Court will apply them in the way they are intended. Connerty v. Metropolitan District Commission, 398 Mass. 140, 143 (1986).
In assessing the situation on a motion to dismiss the Court must assume the provability and correctness of Chokel’s allegations that the Directors timed the exercise of the OEP to take advantage of the “depressed” price of the "tracking” stock, and accelerated the announcement once the market price began to increase. Further, the Court must conclude that the exchange was timed to occur when “Biosurgeiy stock was substantially undervalued relative to its intrinsic worth and future prospects.” Also, the Court must assume that the Directors “directly benefitted” from the timing of the exchange because they each dis *109 proportionately owned more Genzyme General Division stock than Biosurgery Division “tracking” shares.
Both sides agree that the relationship between a stockholder and a corporation sounds in contract. A corporation’s articles of organization and by-laws, together with the corporation law statute, “define the duties and powers of stockholders and directors with reference to each other and the corporation.” Bushway Ice Cream Co. v. Fred H. Beam Co., 284 Mass. 239, 244-45 (1933). Those original documents form a contract, to which all stockholders have tacitly agreed and by which they are bound. Jessie v. Boynton, 372 Mass. 293, 303 (1977). “A duty of good faith and fair dealing is implicit in the performance of a party’s contractual obligations.” Lafayette Place Associates v. BRA, 427 Mass. 509, 525 (1998).
The covenant of good faith and fair dealing requires “that neither parly shall do anything that will have the effect of destroying or injuring the right of the other party to receive the full fruits of the contract.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72 (1991).
This Court has interpreted this covenant before. It adheres to its previous ruling.
Without a breach of the contract, there can be no claim for a breach of an implied covenant of good faith and fair dealing. The requirement of good-faith performance, under the implied covenant of good faith and fair dealing, ultimately is circumscribed by the obligations actually contained in the agreement. AccuSoft Corp. v. Palo, 237 F.3d 31 (1st Cir. 2001).
Kroutik v. Momentix, Inc., Suffolk Superior Court No. 01-2895 BLS, Memorandum and Order on Cross-Motions for Summary Judgment, April 2, 2003, pp. 11-12.
Here, the Genzyme Directors acted precisely in accord with the provisions of the Articles — the contract. This Court cannot, and should not, add language to the contract that the parties did not choose. There is nothing in the Articles that mandates that the Directors must calculate their timing for an OEP to be consistent with some undefined perception of where the market in the stock in issue may be going or, if it seems to be rising, when it has achieved its peak.
The Genzyme Articles define what is meant by fair market value for purposes of the OEP. That is what every purchaser of Genzyme Biosurgery Division “tracking” stock must be presumed to know and understand. The exercise of the OEP cannot be subject to the subjective belief of an investor/stockholder that some “true” market value was not achieved and thereby leave the Directors and the corporation subject to a suit for breach of the implied covenant of good faith and fair dealing. New or independent rights or duties separate from those already in a contract cannot be added by a judge in the cloak of the implied covenant of good faith and fair dealing. See, e.g, Bateman v. FDIC, 112 F.Sup.2d 89, 97 (D.Mass. 2002). “The requirement of good faith performance, under the implied covenant of good faith and fair dealing, ultimately is circumscribed by the obligations actually contained in the agreement.” Belmont L.V. Land Limited Partnership v. Lake Vista Village Limited Partnership, Suffolk Superior Court, No. 98-5119 BLS, Memorandum and Order on Lake Vista Villa Limited Partnership’s Renewed Motion for Summary Judgment.
This is not, as Chokel argues, a situation in anyway similar to that in Fortune v. National Cash Register Co., 373 Mass. 96 (1977). Nor is it one governed by the Delaware decisions of Winston v. Mandor, 710 A.2d 835 (Del.Ch. 1997), and Gale v. Bershad, 1998 WL 118022 at *1 (Del.Ch., March 4, 1998). The Directors here have no duty or obligation under Genzyme’s Articles, in the face of available daily Closing Prices on the NASDAQ, to determine the fair market value of the shares in issue. The Articles themselves make that determination. Also, there is alleged in the complaint that the Directors, on April 16, 2003, “knew” certain “positive facts” about the Biosurgery Division’s first-quarter performance and plans for clinical trials of a new product. But the complaint further reveals that on that same day Genzyme disclosed that information with its publication of its first-quarter results and that the market responded to the news. This can hardly rise to proof that the Directors manipulated the market by their actions.
For how long must the Directors have waited to announce the OEP? Nothing in the Articles suggests any time. There was no contractual obligation to wait at all.
There is nothing in the complaint that alleges a case for breach of fiduciary duty. What is claimed is a breach of contract, or more directly a breach of a covenant implied in the contract, which is not a breach of a fiduciary duiy. Any duties or obligations are defined by the contract, not the respective relationship of the parties.
Nor does the fact that the Directors, or some of them, may own more Genzyme Division stock than Biosurgery Division stock amount to a disqualification from their exercising their business judgment on a matter permitted by the Articles. The Delaware case of In re Staples, Inc. Shareholders Litig., 792 A.2d 934, 950 (Del.Ch. 2001), does not, as Chokel claims, support his legal charge.
ORDER
For the foregoing reasons, and the arguments in the defendants’ memoranda, the defendants’ Motion to Dismiss the Plaintiffs Complaint is ALLOWED.