Smith, Herman J., J.

INTRODUCTION

Plaintiffs, Winlake II, Inc. (“Winlake II”), doing business as Curves for Women, Arlington (“Arlington Curves”), and Kathleen Hennessy (“Hennessy”), filed this action against Defendant, Donald H. Mercier (“Mercier”), individually and as trustee of the Maples Really Trust (“Maples Realty”), seeking damages for the alleged misconduct of Mercier in the execution of a lease agreement for a commercial property in Arlington, Massachusetts (“Arlington”). The plaintiffs allege that Mercier breached the implied covenant of good faith and fair dealing (Count I), committed fraud (Count II) and violated G.L.c. 93A (Count III) by misrepresenting and failing to disclose material facts related to the condition of the real property. This matter is now before this Court on the defendants’ motion for summary judgment pursuant to Mass.R.Civ.P. 56 as to Counts I, II and III. For the reasons discussed hereinafter, Mercier’s motion for summary judgment on all counts is ALLOWED.

BACKGROUND

The relevant facts, either undisputed or taken in the light most favorable to the plaintiffs, are as follows. Hennessy is an officer, employee and authorized representative of Winlake II, which owns and operates Arlington Curves. Hennesy also has served as an officer of Winlake I, Inc., which owns a Curves for Women (“Curves”) franchise in Melrose, Massachusetts (“Melrose Curves”). Hennessy has an ownership interest in both Winlake I and Winlake II and has acquired a partial ownership interest in a Curves in Ireland. She is employed as the manager of Arlington Curves and Melrose Curves, and has been employed as an office manager.[1]
In July 2002, Hennessy began to search for commercial properties in and around Arlington in which to locate a Curves franchise. Hennessy recently had opened Melrose Curves. Hennessy found a suitable commercial space located at 799-801 Massachusetts Avenue, Arlington, Massachusetts (“the Premises”), which had been advertised for lease. Subsequently, Hennessy contacted Mercier to discuss the potential occupancy of the Premises. Maples Realty, of which Mercier is the sole trustee, is the title owner of the Premises.
Hennessy initially contacted Mercier to inquire into the availability and readiness of the Premises for a fitness center. Mercier indicated that the Premises was ready for occupancy save some cosmetic restorations. At that time, the Premises had been leased as a newspaper distribution facility. Thereafter, Hennessy and her son, William Stroud (“Stroud”), the president of Winlake II, engaged in several conversations with Mercier concerning the Premises, during which Stroud and Hennessy informed Mercier that the Premises needed to accommodate a fitness center with minimal renovations. Mercier again stated that the Premises required only cosmetic improvements. Mercier also indicated that the Premises, at that time, complied with applicable state building and fire code regulations. During these conversations, Mercier did not suggest that he possessed specific knowledge of the requirements or conditions of the Premises for a fitness center.
In late July 2002, Hennessy decided to inspect the Premises with Mercier. During her inspection of the Premises, Hennessy did not examine the electrical, plumbing, heating, ventilating, and/or cooling systems within the Premises. Nor did Hennessy inquire into the state of the Premises’ mechanical systems. Instead, Hennessy conducted a cursoiy visual inspection of the Premises. Subsequent to that initial inspection, Hennessy and Stroud examined the Premises with Mercier. During that inspection, Mercier reiterated that the Premises required only superficial modifications. Hennessy and Stroud observed that the Premises would require painting, carpeting and a new toilet facility, for which Hennessy and Stroud deter *168 mined that the cost would total less than $5,000.00. Hennessy and Stroud asked Mercier whether he would pay for such repairs; Mercier declined to do so. Hennessy and Stroud also discussed with Mercier the proposed terms of the lease. Hennessy and Stroud neither inspected nor discussed with Mercier the condition of the mechanical or electrical systems of the Premises at that time. Following that second inspection, Hennessy returned to the Premises with a general contractor.[2] Hennessy and the general contractor neither examined nor questioned the functionality of the mechanical systems of the Premises at that time. Mercier did not refer to the electrical or mechanical systems of the Premises during any of the above-described inspections.
On or about July 23, 2002, Hennessy, individually, entered into a Standard Form Commercial Lease (“Lease Agreement”) with Maples Realty for the Premises. The initial term of the lease commenced on October 1, 2002 and terminated on September 30, 2005. Under the Lease Agreement, Hennessy agreed to pay to Maple Realty an annual rent of $21,600.00 for the initial term of the lease, with an option to extend the lease for an additional two years at an annual rent of $24,000.00. The Lease Agreement provides that Hennessy shall bear the expense of any alterations to the Premises. The Lease Agreement further states that Hennessy agreed to maintain the condition of the Premises and that the Premises was in “good order” at the time of the execution of the Lease Agreement. The expressed purpose of the Lease Agreement is to provide Winlake II with a physical location within which to operate a Curves franchise.
In October 2002, after minor renovations to the Premises had commenced and in anticipation of the opening of Arlington Curves, Hennessy contacted the Arlington Inspectional Services Department (“Inspectional Services”), which enforces Massachusetts’ building, wiring, plumbing, and fuel codes as well as Arlington’s zoning bylaws. Mike Byrne (“Byrne”), an Inspectional Services employee, informed Hennessy that a Certificate of Occupancy was required to open Arlington Curves, the issuance of which was contingent upon a compliance inspection of the Premises. Byrne further stated that he could not directly speak to Hennessy, but could communicate with a contractor regarding the Premises. Accordingly, Hennessy hired Martin Conneely (“Conneely”) of Conneely Contracting, Inc. to facilitate the inspection and permit processes.
At some point thereafter, Inspectional Services conducted an inspection of the Premises. Conneely then met with Byrne to discuss the results of the inspection. Byrne informed Conneely that the Premises would require additional repairs and renovations to comply with existing commercial building codes. Subsequently, Conneely notified Hennessy of the additional work required before a Certificate of Occupancy could be issued for the Premises. That work entailed, among other renovations, repair of the electrical, ventilation, and fire detection systems as well as plumbing and drainage upgrades. Conneely estimated the cost of the repairs at $19,000.00.
Upon learning of the estimated cost of the repairs, Hennessy contacted Mercier to request that he pay for such repairs. Mercier explained to Hennessy that he would neither pay for nor undertake to repair the Premises. Hennessy then solicited proposals and estimates from general contractors for the necessary repairs. After receiving several proposals, Hennessy hired Whittemore Remodeling (“Whittemore”) to upgrade the Premises. Again, Hennessy requested that Mercier pay for the repairs, and Mercier refused to make any such payment. Hennessy never attempted to rescind the Lease Agreement after learning of the necessary repairs.
In connection with Whittemore’s work proposal, Hennessy discovered that she needed a special zoning permit to perform the necessary repairs, after which Hennessy retained the assistance of an attorney to apply for and obtain the permit. On October 25, 2002, the Arlington Zoning Board of Appeals conducted a hearing on Hennessy’s application for a special permit, during which it voted to grant the special permit requested. Thereafter, Whittemore, and various subcontractors, commenced work on the Premises. The proposed work was completed in or around February 2003, the total cost of which amounted to approximately $34,000.00. The anticipated opening date of Arlington Curves had been October 12, 2002. Arlington Curves actually opened on February 23, 2003.
On or about January 7, 2005, the plaintiffs filed this complaint. The plaintiffs argue that Mercier’s alleged misrepresentations of the condition of the Premises and his failure to disclose the defects in the mechanical and electrical systems resulted in the expenditures undertaken by the plaintiffs to obtain the Certificate of Occupancy for Arlington Curves, which ultimately delayed the opening of the fitness facility and imposed costs in excess of those anticipated by the plaintiffs. Specifically, the plaintiffs claim that Mercier breached the implied covenant of good faith and fair dealing (Count I), committed fraud (Count II) and violated G.L.c. 93A (Count III). Mercier has moved for summary judgment on all counts.

DISCUSSION

1. Standard for Summary Judgment
Summary judgment shall be granted only where there are no issues of material facts in dispute and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Comm’r of Com. 390 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party. G.S. Enters, Inc. v. *169 Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). The moving parly bears the burden of affirmatively demonstrating the absence of a triable factual issue and of showing that it is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Once the moving party demonstrates the absence of a triable issue, the non-moving party must set forth specific facts establishing the existence of a genuine dispute as to a material fact. Correllas v. Viveiros, 410 Mass. 314, 317 (1991). “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and requires summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Even if the facts of the case are disputed, “summary judgment is still available if the party with the burden of proof at trial. . . fails to present in the summary judgment record, taking everything it says as true and drawing all reasonable inferences in its favor, sufficient facts to warrant a finding in its favor.” NG Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002).

A. Breach of Implied Covenant of Good Faith and Fair Dealing

The plaintiffs allege that Mercier breached the implied covenant of good faith and fair dealing insofar as Mercier misrepresented the condition of the Premises for a fitness center and failed to disclose to Hennessy certain deficiencies in the Premises prior to the execution of the Lease Agreement. More succinctly, Hennessy asserts Mercier breached the implied covenant of good faith and fair dealing because Mercier represented that the Premises would be suitable and fit for her commercial purposes without significant alteration and expense, which was not the case. However, because the implied covenant of good faith and fair dealing is shaped by the nature of the contractual relationship from which the implied covenant derives, this Court must look to the terms of the Lease Agreement agreed upon by Hennessy to determine the existence of any representations or warranties contained therein, the breach of which forms the basis of Hennessy’s claim. Hawthorne’s, Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 211 (1993).
As a preliminaiy matter, this Court must determine whether the Lease Agreement represents the complete and final agreement between Hennessy and Maple Realty regarding the lease of the Premises. Absent a contractual integration clause, whether a written instrument constitutes a final integrated agreement is a question of the intention of the parties. Caputo v. Cont’l Constr. Corp., 340 Mass. 15, 13 (1959). A written instrument which appears on its face to be complete is presumed to be an integrated contract in the absence of evidence to the contraiy. Robert Indus., Inc. v. Spence, 362 Mass. 751, 754 (1973). That presumption of integration, however, does not apply to circumstances in which the written instrument is manifestly incomplete or is ambiguous.
Here, the Lease Agreement is a completely integrated contract between Hennessy and Maple Realty. The Lease Agreement contains the essential terms necessaiy to form a lease, to which Hennessy manifested her acceptance by signing the agreement. Furthermore, the terms of the Lease Agreement appear consistent and unambiguous. Moreover, the Lease Agreement makes no mention that it constitutes only a proposal or summary of the parties’ agreement. There is nothing in the Lease Agreement to put the fullness of the agreement in question. Therefore, this Court finds that the Lease Agreement is the complete, integrated expression of the terms of the parties’ agreement with respect to the Premises.
This Court next must examine the Lease Agreement to determine whether there exists any ambiguity or uncertainly about the meaning of its terms that would create an issue of fact for the juiy. Jefferson Ins. Co. v. Holyoke, 23 Mass.App.Ct. 472, 475 (1987). A contract’s language is ambiguous where its “terms are inconsistent on their face or where the phraseology can support reasonable difference(s) of opinion as to the meaning of the words employed and obligations undertaken.” Coll v. PB Diagnostic Syst., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995); Mejia v. Am. Cos. Co., 55 Mass.App.Ct. 461, 465 (2002). It is “elementary that an unambiguous agreement must be enforced according to its terms.” Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). Parties are bound by the plain terms of their contract. Forte v. Caruso, 336 Mass. 476, 480-81, (1957). Furthermore, where the parties to a contract agree to be bound by the written agreement, neither party can reasonably rely on any contraiy statements made during negotiations. McCartin v. Westlake, 36 Mass.App.Ct. 221, 232-34.
In this case, the terms of the Lease Agreement are clear and unambiguous. The language employed in the Lease Agreement does not obfuscate the meaning and effect of the agreement. Indeed, the Lease Agreement comprises a standard commercial lease, the terms of which reflect the basic provisions of a lease agreement. Furthermore, neither party has expressed uncertainly about the terms of the Lease Agreement. Nor is there evidence that the parties have operated under contradictory interpretations of the Lease Agreement. Therefore, consistent with general principles of contract, the parties are bound by the plain terms of the Lease Agreement, and the subjective contemplations of the parties are irrelevant. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992); Hiller v. Submarine Signal Co., 325 Mass. 546, 550 (1950).
The terms of the Lease Agreement provide that Hennessy shall maintain the Premises in the same condition as it existed at the commencement of the term of the lease and shall prevent any damage to the Premises. The Lease Agreement further provides that *170 Hennessy acknowledged that the Premises was in “good order” when the parties executed the Lease Agreement. Although the Lease Agreement recognizes that the Premises are to be used for the purpose of a fitness center, this expression of purpose does not constitute a provision expressly warranting the suitability of the Premises for such a purpose. Rather, upon a plain reading, that provision merely demonstrates Maple Realty’s desire that the plaintiffs not use the Premises for a purpose not agreed upon by the parties so as to protect its interests in the property. In fact, nowhere in the Lease Agreement does Maple Realty or Mercier provide warranties as to the suitability of the Premises for a fitness facility. Therefore, abiding by the terms of the Lease Agreement, there exists no express warranty of suitability to which the parties agreed to be bound. Even if Mercier had orally given such a warranty prior to the execution of the Lease Agreement, the terms of the Lease Agreement would supersede and vitiate any such warranty made. Bilker v. Nat’l Mgmt Corp., 16 Mass.App.Ct. 36, 42 (1983) (express warranties based upon oral statements made prior to the written agreement were unenforceable as a matter of law because they were “superseded by the unambiguous provisions of the integrated written agreement”). Furthermore, absent an express warranty, no warranty of suitability may be implied by law under the circumstances of this case. Gade v. Nat Creamery Co., 324 Mass. 515, 518-19 (1949) (no warranty of suitability will be implied in the context of commercial lease transactions). Consequently, there is no evidence of the existence of a warranty of suitability which this Court may enforce in this case.
The implied covenant of good faith and fair dealing exists to ensure that the objectives of a contract may be carried out. Crelling Technologies v. Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir. 1994). Accordingly, the implied covenant provides a safeguard with respect to the performance of the contract and the enforcement of the terms of the contract. Hawthorne’s, Inc., 414 Mass. at 211. “The scope of the covenant is only as broad as the contract that governs” the relationship of the parties to the contract. Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 385 (2005). Consequently, in this case, the terms of the Lease Agreement dictate the applicability of the covenant. However, as discussed earlier herein, the Lease Agreement does not provide for, neither expressly nor impliedly, a warranty of suitability concerning the use of the Premises for a fitness center. In light of the fact that no such warranty exists in the Lease Agreement, Maple Really and Mercier did not breach the terms of the Lease Agreement when it leased the Premises to Hennessy for the purpose of a fitness facility. Gade, 324 Mass. at 518 (“The lessee takes the premises as he finds them”). Because the implied covenant “pertains to bad faith in the performance of a contract, not in its execution,” without a breach of the underlying contract, a claim for a breach of the implied covenant of good faith and fair dealing cannot lie. See Sheehy v. Lipton Indus., Inc., 24 Mass.App.Ct. 188, 194 n.6 (1981); Chokel v. Genzyme Corp., Civ. No. 03-2520 (Suffolk Sup.Ct. Nov. 12, 2003) (Van Gestel, J.) (17 Mass. L. Rptr. 83). Since the plaintiffs do not allege bad faith or breach in the performance of the Lease Agreement, but only in the conduct of Mercier leading up to the execution of the Lease Agreement, Hennessy’s claim for a breach of the implied covenant of good faith and fair dealing must fail.[3] Therefore, Mercier’s motion for summary judgment as to Count I of the plaintiffs’ complaint is ALLOWED as a matter of law.

B. Fraud

The plaintiffs’ claim for fraud consists of allegations that Mercier misrepresented the condition of the Premises, failed to disclose to Hennessy material defects in the Premises, and that damage resulted therefrom. Mercier argues that he neither misrepresented the suitability of the Premises for a fitness center nor had a duty to disclose any defective conditions therein. In essence, Mercier contends that he afforded the plaintiffs ample opportunity to inspect the Premises to assess its amenability to a fitness center, and the plaintiffs’ decision to lease the Premises for that purpose under the terms of the Lease Agreement was entirely their own.
To prevail on a claim for fraud, the plaintiffs must establish by a preponderance of the evidence that they reasonably relied to their detriment on a false statement of material fact made by the defendant to induce the plaintiffs to act. Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982). A claim for fraud must be based on statements of fact as opposed to statements of opinion, estimate, expectation, belief or judgment. Powell v. Rasmussen, 355 Mass. 117, 118 (1969). However, a statement in the form of an opinion, belief or judgment may be actionable as a statement of material fact “if the representation is false and the subject matter is one susceptible of actual knowledge.” Briggs v. Carol Cars, Inc., 407 Mass. 391, 396 (1990). This circumstance is particularly true where the maker of the statement is in a position for which he may have special knowledge of facts. Id. Failure to disclose a material fact constitutes fraud where there exists a duty to disclose such facts. Ravosa v. Zais, 40 Mass.App.Ct. 47, 51 (1996); Greenery Rehab. Group v. Antaramian, 36 Mass.App.Ct. 73, 78 (1994).
Here, the plaintiffs allege that Mercier failed to disclose defects and flaws in the Premises, for which he had a duty to disclose, during their interactions leading up to the execution of the Lease Agreement. Whether Mercier was under a duly to disclose certain facts to the plaintiffs, in particular Hennessy, depends upon whether Mercier failed in some way to comply with a duly owed to the plaintiffs. Goodwin v. Agassiz, 283 Mass. 358, 362 (1933) (commenting that mere *171 silence usually does not amount to a breach of a duty, but the parties may stand in such relation to each other that an equitable responsibility arises to communicate certain facts).
A duty to disclose arises in a number of discrete circumstances. For instance, a duty to disclose may arise if there exists a “fiduciary or other similar relation of trust and confidence between [the parties].” Swinton v. Whitinsville Sav. Bank, 311 Mass. 677, 678 (1942). Such a relationship may occur by virtue of a longstanding relationship, or a confidence reposed by one party upon another, and thus may be breached by an abuse of that confidence or an exertion of influence over one party by the other for its own advantage. Warsofsky v. Sherman, 326 Mass. 290, 293 (1950). However, the concept of fiduciary relationship, and its attendant duties, has not been extended to “purely commercial transactions.” Salinsky v. Perma-Home Corp., 15 Mass.App.Ct. 193, 197 (1983).
In this case, the record reveals that the execution of the lease agreement constituted a commercial transaction between two business people. Hennessy, by her own admission, is experienced in business, and Mercier, as sole trustee of Maple Realty, is engaged in the business of leasing or selling real property owned by Maple Realty. As such, motivated to open another Curves fitness center and prompted by Mercier’s advertisement, Hennessy sought out Mercier to effectuate the lease of the Premises to serve her commercial purposes. Furthermore, there is no evidence of a prior family relationship, or close personal or professional relationship between Mercier and Hennessy. See Id. Therefore, it is apparent from the record that the Lease Agreement was entered into as a result of an arm’s-length transaction between two distinct business people. However, business relationships or arm’s-length transactions do not, in general, give rise to a fiduciary relationship. McIntyre v. Okurowski, 717 F.Sup. 10, 11 (D.Mass. 1989). Nor may a party create such a relationship by imposing trust and confidence in the other party in circumstances in which both parties are experienced business people operating at arm’s length. See Broomfield v. Kosow, 349 Mass. 749, 758-59 (1965). Consequently, absent the existence of a fiduciary relationship, Mercier did not owe to Hennessy a duty to disclose. The plaintiffs’ claim based upon Mercier’s nondisclosures is, thus, one of “mere failure to reveal,” which does not itself amount to a claim for fraud. Nei v. Burley, 388 Mass. 307, 310 (1983); Swinton v. Whitinsville Sav. Bank, 311 Mass. 677, 678-89 (1942).[4]
Notwithstanding this Court’s finding that Mercier had no duly to disclose, Mercier did in fact make statements to Hennessy prior to the execution of the Lease Agreement concerning the qualities of the Premises for a fitness facility. Specifically, Mercier repeatedly stated to Hennessy that the Premises would require only cosmetic work to accommodate a fitness center. In light of those representations, this Court must determine whether such statements could be considered fraudulent.
As discussed hereinabove, to be actionable, a claim for fraud must be based on false statements of fact, the subject matter of which is susceptible of actual knowledge. A statement of expectation, opinion, belief or judgment is not a false statement of fact for the purposes of a claim for fraud. The difference between statements of fact and opinion may sometimes be a difficult distinction to discern. See McEneaney v. Chestnut Hill Realty Corp., 38 Mass.App.Ct. 573, 575 (1995). “A statement that in form is one of opinion may constitute a statement of fact if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts incompatible with it.” Id. Whether the statements made were indeed false is fypically a question of fact for the jury.
Here, Mercier made certain representations to Hennessy as to the fitness of the Premises for her intended use. Such statements, even if in the form of an opinion or judgment, could have been understood by Hennessy as having some basis in fact because Mercier owned and operated the Premises, and ostensibly had a commensurate degree of knowledge and sense about the condition of the Premises. Therefore, for the purposes of this summary judgment motion, this Court will assume that there exist factual questions as to whether Mercier’s statements were opinion or fact as to this element of plaintiffs’ claim for fraud.
However, even if Mercier’s statements were not opinion, the plaintiff must also meet the element of reasonable reliance. Here, the plaintiffs further claim that Hennessy reasonably relied on Mercier’s statements to their detriment. The reasonableness of Hennessy’s reliance on Mercier’s representation is also a question of fact. Reliance on a statement is unreasonable where the falsity of the statements is obvious, or the plaintiff has reason or should have had reason to know of facts which would then make the reliance unreasonable. Saxon Theater Corp. of Boston v. Sage, 347 Mass. 662, 667 (1964). Unreasonable reliance is a complete bar to a claim for fraud. Mahaney v. John Hancock Mut. Life Ins. Co., 6 Mass.App.Ct. 919, 920 (1978).
In this case, while reliance is ordinarily a question of fact, having numerous opportunities to inspect the Premises and to validate Mercier’s statements, it was unreasonable for Hennessy, who had a business background and experience in the franchise of Curves fitness facilities, to have relied on Mercier’s statements to decide to lease the Premises for a Curves franchise. See Nei, 388 Mass. at 311. Mercier did not purport to have experience in or knowledge of the structural and zoning requirements necessary to operate fitness facilities; rather, such experience rested solely with Hennessy. Nor did Mercier represent that the Premises *172 had been used for a similar commercial operation in the past. In fact, there is no evidence that the Premises had ever been used as a fitness facility. Further, there is no evidence that Mercier had ever owned or leased a building that was used as a fitness facility. Nonetheless, the record shows that Hennessy decided to act pursuant to the general statements of Mercier about the general conditions of the Premises. Under these circumstances, Hennessy’s reliance on Mercier’s statements was unreasonable and unsound. Consequently, reasonable reliance being an essential element of fraud, Mercier’s motion for summary judgment on Count II is ALLOWED as a matter of law.
C. Violation of G.L. 93A, §11
The plaintiffs’ violation of G.L.c. 93A, §11 claim is premised on their allegation of fraud. It is well-established that fraud may constitute a violation of c. 93A. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 48, 62 (2004); McEvoy Travel Bureau, Inc. v. Norton, Co., 408 Mass. 704, 714 (1990). More precisely, misrepresentations of material facts may constitute unfair and deceptive practices as defined under c. 93A. Whether a given business practice is unfair or deceptive must be determined from the circumstances of each case. Noyes v. Quincy Mutual Fire Ins. Co., 7 Mass.App.Ct. 723, 726 (1979).
Although c. 93A reaches far beyond the scope of common law, where a plaintiffs c. 93A, § 11 claim is based solely on an underlying claim for fraud which cannot succeed, summary judgment on the c. 93A claim is appropriate. See Macoviak v. Chase Home Mortgage Corp., 40 Mass.App.Ct. 755, 760 (1996). In spite of this Court’s conclusion that the plaintiffs’ claim for fraud cannot survive summary judgment, because this Court finds that Mercier’s statements to Hennessy made during discussions prior to the execution of the Lease Agreement present issues of fact concerning whether Mercier falsely represented the condition of the Premises, the absence of reasonable reliance will not foreclose the plaintiffs’ claim under c. 93A. Int’l Fid. Ins. Co. v. Wilson, 387 Mass. 841, 850 (1983). Accordingly, this Court turns its attention to whether Mercier’s conduct preceding the execution of the Lease Agreement exhibited the type of unfair and deceptive practice contemplated under c. 93A.
There is no dispute that the lease of the Premises occurred in a business context, and, as such, the parties were engaged in trade or commerce within the purview of c. 93A §11. Leardi v. Brown, 394 Mass. 151, 159 (1985). However, to be actionable under c. 93A alleged unfair business practices must realize a “level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce” Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). In general, circumstances in which such a level has been attained involve the exploitive acts of an experienced business person perpetrated upon a relative neophyte. See Spence v. Boston Edison Co., 390 Mass. 604, 616 (1983); Lantner v. Carson, 374 Mass. 606, 610 (1978). The requisite degree of “rascality” made actionable by c. 93A §11 is heightened in circumstances involving a transaction at arm’s length between experienced business people. See Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 475 (1991).
In this case, upon examination of the summary judgment record, the evidence does not permit a finding that Mercier’s conduct reached the level of “rascality” required in transactions between businesses people. This is not a case in which a transaction occurred between a “worldly-wise” business person and a “commercial innocent.” Spence, 390 Mass. at 616. Instead, the record demonstrates that Mercier and Hennessy, in their roles of business people, engaged in an arm’s-length transaction consistent in nature with the lease of a commercial space. Indeed, Hennessy had previously performed a similar lease transaction for the purpose of opening another fitness center named Melrose Curves. Furthermore, although Mercier may have been careless and overeager in his representations to Hennessy, there is no evidence that Mercier discouraged Hennessy from making her own judgments and determinations concerning the propitiousness of the transaction. To the contrary, Hennessy had plenty of opportunity to inspect the Premises and to consult with contractors who specialize in commercial buildings prior to the execution of the Lease Agreement. In fact, Hennessy did take advantage of the opportunity to inspect the Premises. Therefore, although not beyond reproach, this Court finds that Mercier’s conduct is not of the “sufficiently egregious” variety necessary to invoke the protection of c. 93A §11. Levings, 8 Mass.App.Ct. at 504. Consequently, Mercier’s motion for summary judgment on Count III is ADLOWED.

ORDER

For the foregoing reasons, it hereby ORDERED that the Motion For Summary Judgment on Counts I, II, and III filed by defendant Donald H. Mercier, Individually and as Trustee of the Maples Realty Trust, is ALLOWED.

Hennessy has acknowledged that she had prior business experience at the time she entered into the Lease Agreement. See Pls.’ Resp. to Def.’s Statement of Uncontested Material Facts Pursuant to Superior Ct. Rule 9A(b)(5) at 3.

Neither Hennessy nor Mercier are certain whether this inspection occurred before or after the parties executed the Lease Agreement.

The implied covenant of good faith and fair dealing may not be “invoked to create rights and duties not otherwise provided for in the existing contractual relationship.” Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).

The plaintiffs do not suggest that Mercier acted to conceal the alleged defects in the Premises or prevented the plaintiffs from uncovering such defects. See Swinton, 311 Mass. at 678-89.